OPINION
Appellant, Christa M. Josslin, appeals an order of the Butler County Court of Common Pleas, Juvenile Division, granting legal custody of her nine-year-old son, Max T. Josslin ("Max"), to appellees, Diana Barrett and her husband, Paul Barrett. Diana Barrett is appellant's sister and Max's maternal aunt.
Max was born on May 12, 1988. Max was primarily raised by appellant in California until Travis Bonito ("Travis"), Max's oldest brother and appellant's oldest son, was involved in an automobile accident on December 11, 1994. That day, Travis, who was driving with a suspended driver's license with the knowledge and permission of appellant, was struck by a drunk driver. The accident rendered Travis quadriplegic.
Prior to December 1994, appellant's care of Max was questionable. The record shows that Max's dental needs were severely neglected and that Max looked unkept and was not always clean. Diana Barrett, who lived in California until she and her husband moved to Salt Lake City, Utah in October 1994, testified that Max did not have a lot of supervision and that he was allowed to run free outside in his neighborhood.
Karen Eckert, a school secretary at the Sacramento, California elementary school where Max was enrolled from November 2, 1993 to January 20, 1995, testified that Max had a poor attendance record in kindergarten which became worse in first grade. Not only did Max have a number of unexcused absences, he was also often tardy at the beginning of the school day. Eckert testified that whenever Max was not in school by 9:00 a.m., the school would call, and in the process wake up appellant, who in turn would drop Max off at the school between 9:30 and 10:00 a.m. School started at 8:05 a.m. Eckert also testified that although school ended at 1:53 p.m., Max was often not picked up for an hour or an hour and a half after school. As a result, Max was forced to wait in the care of the school personnel. A few times, Max was at school until 4:30 p.m.
Eckert testified that although appellant was always nice, she was also always nervous, hyper, looked disheveled at times, and "always had a million excuses" as to why she had not picked up Max. Ann Bonito, the mother of appellant and Diana Barrett, concerned about Max's truancy record and that he was being neglected, contacted Children's Protective Services, but to no avail. Appellant admitted that Max's attendance record was not very good but opined that it was not "harming him a whole lot" because Max was an exceptionally good student.
Following Travis' accident, appellant became his guardian but was removed from this position by the state of California due to her inability to properly care for Travis and manage his estate. Appellant was eventually convicted of the criminal charge of abuse of a dependent person, and a conservator was appointed to manage Travis' personal care and estate. In January 1995, Max went to live with appellees. Because of her preoccupation with Travis after his accident, appellant voluntarily permitted appellees to assume guardianship of Max in April 1995. On April 17, 1995, an order of the Superior Court of Sacramento County, California appointed appellees as guardians of Max.
On August 1, 1995, Paul Barrett, who is a pilot for Delta Airlines, was transferred to Cincinnati, Ohio. Appellees moved to Oxford, Ohio with Max in August 1995 and have lived there ever since. Diana Barrett testified that while they lived in Utah, there was a lot of contact with appellant. Diana Barrett testified, however, that since they have moved to Ohio, appellant has not visited Max due to her limited financial resources, has sporadically called Max, and has sent three packages and five letters. Diana Barrett also testified that she has encouraged Max to call his mother and that he had done so occasionally.
Since taking care of Max in January 1995, appellees have taken Max to California three times to visit with his mother. Each time, the visits were chaotic. At the first visit, appellant did not allow appellees to take Max back until after their brother intervened. The second visit, which took place two weeks later, was cut short at appellant's request after she had a fight with her husband, David Heaffey.[1] At the end of the third visit, which took place in August 1996, appellees had to have the police involved so that appellant would let Max leave with appellees. During that visit, appellant paid little attention to Max, instead sending him to the landlord who lived upstairs to watch television and videos. During one of the visits, Max had to sleep in a cardboard box due to inadequate bedding.
On March 12, 1996, appellees filed a petition for legal custody of Max. A hearing was conducted on the petition on May 2, 1997. By judgment entry filed June 17, 1997, the trial court granted legal custody of Max to appellees. The trial court found "by a preponderance of the evidence that [appellant] ha[d] a total inability to provide the care or support of Max Josslin[,]" that appellant was "otherwise unsuitable to provide the proper care for Max Josslin and that an award of custody to her would be detrimental to Max Josslin." This timely appeal followed.
In her sole assignment of error, appellant argues that the trial court's decision to grant custody of Max to appellees was against the manifest weight of the evidence. Appellant contends that there is no clear and convincing evidence that Max's best interest "would be served by granting permanent custody to [appellees]."
We note at the outset that appellant misconstrues the type of proceedings that were before the trial court. Contrary to appellant's assertion, appellees did not seek and obtain permanent custody of Max, but rather legal custody. A significant difference exists between the two dispositions. R.C.2151.011(B)(11) defines permanent custody as:
 * * * a legal status which vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of any and all parental rights, privileges, and obligations, including all residual rights and obligations.
R.C. 2151.011(B)(9) in turn defines legal custody as:
 [A] legal status which vests in the custodian the right to have physical care and control of the child and to determine where and with whom he shall live, and the right and duty to protect, train, an discipline him and to provide him with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.
One of the most obvious differences between the two dispositions is that the parents' rights to the child are completely terminated when permanent custody is awarded, whereas residual parental rights are retained by the parents under legal custody. In re Hitchcock (Nov. 21, 1996), Cuyahoga App. Nos. 69291 and 69292, unreported. Residual parental rights are defined by R.C.2151.011(B)(10) as "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including but not necessarily limited to the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support."
It "is well recognized that the right to raise a child is an `essential' and `basic' civil right," and that "parents `must be afforded every procedural and substantive protection the law allows.'" In re Hayes (1997), 79 Ohio St.3d 46, 48, quoting Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, and In re Smith (1991), 77 Ohio App.3d 1, 16. It has also been "deemed `cardinal' that the custody, care and nurture of the child reside, first, in the parents." In re Murray (1990), 52 Ohio St.3d 155,157, following H.L. v. Matheson (1981), 450 U.S. 398,101 S.Ct. 1164. However, a parent's interest in the care, custody, and management of his or her child is secondary to that of the best interest of the child. In re Shaeffer Children (1993), 85 Ohio App.3d 683, 690, discretionary appeal not allowed (1993), 67 Ohio St.3d 1451. A juvenile court may deny custody of a child to his parents "if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable — that is, that an award of custody would be detrimental to the child." In re Perales (1977), 52 Ohio St.2d 89,98. When granting legal custody, the trial court "retains continuing jurisdiction, and may modify its prior custody award or grant custody to another party if a change in circumstances makes it necessary." In re Byrd (1981), 66 Ohio St.2d 334,338.
It is well-established that when a trial court's judgment is supported by some competent, credible evidence going to the essential elements of the case, the judgment will not be reversed by a reviewing court as being against the manifest weight of the evidence. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80. Likewise, a juvenile court's "best interest" analysis and decision will not be overturned when the decision is supported by competent, credible evidence. In re George (June 17, 1996), Brown App. No. CA95-08-013, unreported.
In the case at bar, the record shows that appellant has not had stable and permanent housing since November 1995. Appellant testified that from November 1995 through January 1996, she and her husband, Heaffey, stayed at two different motels. One motel did not have a kitchen. They left the other motel because it was dirty, loud, full of street people, and there were "a lot of kids running around that looked like they weren't being taken care of." In February 1996, appellant and Heaffey stayed at the house of a drug addict who sold methamphetamine for a living. Appellant testified that between March and December 1996, they rented an apartment from Debra Banes. Appellant admitted that Banes evicted them in December for nonpayment of the rent. On the day of her deposition, conducted on February 26, 1997, appellant and Heaffey were sharing a one bedroom apartment with another tenant. Appellant testified that the apartment had live exposed wires and that the yard had raw sewage and waste running throughout. Appellant also testified that she and Heaffey had found another place to live in a four unit apartment building. Appellant explained that the building's owner had agreed to let appellant and Heaffey live in one unit rent free in exchange for Heaffey remodeling the three other units. Appellant admitted that the agreement was just verbal.
Debra Banes, appellant's former landlord from March through December 1996, testified she evicted appellant for nonpayment of rent for two months and for flooding the apartment. Banes also testified as to the numerous problems she had had with appellant. Not only was the rent virtually never paid on time, it was also never paid in full. Rent was also paid several times by other people. Appellant and Heaffey smoked heavily in the apartment even though it was forbidden by Banes and failed to maintain the apartment and keep it clean. They also had a lot of "people living there or visiting all hours of the night." Banes described these people as "unsavory characters," "losers," "homeless looking." These people were "unclean," unshaven, and with "no haircuts." Banes stated that some of them were former alcoholics or drug addicts.
Banes also testified that she helped appellant and Heaffey by giving them food and clothing and by asking Heaffey to work on the house all three of them lived in in lieu of part of the rent. However, some projects were never completed. Banes also testified that $2,000 worth of material she had bought to be used by Heaffey to build an addition to the apartment for Travis were instead returned to the store by Heaffey, who kept the money. Banes further testified that following their eviction, appellant and Heaffey stole things from Banes' garage and laundry.
The record also shows that neither appellant nor Heaffey have a stable job or a stable source of income. Heaffey, who claims to be a building contractor, does not have a steady job and is underemployed if employed at all. Appellant has not worked since May 1994. During her deposition, appellant testified that they were currently supporting themselves by selling jewelry she had made, by selling personal property and her personal jewelry, and by scrapping metal. Appellant acknowledged that neither had a source of income but that Heaffey had "money coming to him." Apparently, Heaffey planned to file a suit in small claims court against Banes for completed work he was allegedly not paid for. Appellee, Diana Barrett, and their mother, Ann Bonito, all testified that appellant does not know how to mange money. Appellant also testified that she owed $21,000 to a hospital[2]
and "maybe $4,000, five" in utilities. Appellant opined, however, that she did not owe enough to claim bankruptcy.
Appellant testified that she did not "have time really to work" because she spent a lot of time (1) visiting Travis (twelve to fourteen hours a week) and overseeing his care by going to a lot of meetings regarding his care, and (2) transporting Heaffey, who does not have a valid driver's license. The record shows, however, that despite his suspended driver's license, Heaffey nevertheless drives.
Appellant and Heaffey have a history of domestic violence. Bonito testified that they have terrible fights, involving throwing things, and that they have left one another on at least six occasions but would always return. While she does not hit her children, appellant admitted to her mother that she beats Heaffey. Bonito described the relationship between appellant and Heaffey as being "so explosive, it's just unbelievable." Banes testified that she would hear them fighting and that she twice saw appellant with a black eye.
James Josslin, Max's father,[3] was married to appellant from 1981 to 1991. Josslin testified that beginning in 1988 or 1989, following a gallbladder operation, appellant became addicted to prescription medicine (pain killers). Josslin also testified that he first saw appellant use methamphetamine in 1991, which she would get from her new husband, Heaffey. Josslin testified that in the house where appellant and Heaffey lived together from October 1993 to November 1995, there were drugs and loaded guns. Josslin stated that both the drugs and the guns were easily accessible and that no precautions were taken to prevent Max from having access to either the drugs or the guns. Josslin also testified that he had seen both appellant and Heaffey sell drugs out of their house at least a couple dozen times. Josslin stated that drug transactions took place when Max was in the house, albeit not in the room where the transactions occurred.
Appellant testified that she had seen Travis smoke marijuana and that at the time of his accident, he had dropped out of high school. Bonito testified that in September 1994, appellant admitted that she and Heaffey provided marijuana to Travis because doing so was safer than Travis having to deal with drug dealers. Travis has been arrested for possession of methamphetamine and assault with a deadly weapon. Heaffey has been arrested for possession of methamphetamine and assault with a deadly weapon. Appellant has been convicted of petty theft and abuse of a dependent person. Appellant has been arrested for receiving stolen property and diverting utilities and has been accused of welfare fraud.
Both Diana Barrett and Bonito testified that appellant has a very close, special relationship with Travis that she does not have with Max. Josslin testified that while he has seen appellant hug and talk to Max, he has never seen her do activities with Max such as reading, taking a walk, or helping with school projects or homework. Bonito opined that appellant was neither emotionally stable[4] nor a well-adjusted person. Bonito described appellant as a person who is very flighty, looks and acts like a teenager, and who has difficulties keeping her word. Bonito opined that appellant may also have a problem with lying.
Josslin, Banes, Diana Barrett, and Bonito all opined that appellant was not capable of caring for Max were she to have custody. Josslin testified that if appellant was "anything like she was last time [he] saw her," appellant was not physically or mentally capable of caring for a child at this time. Josslin also stated that he would fight a court order to return Max to appellant because he would be concerned that Max's needs would not be met and that he would not be properly taken care of. Banes felt that returning Max to appellant and her lifestyle would be a tragedy. Diana Barrett and Bonito both opined that appellant had not changed and had not made any progress in getting her life together. Bonito felt that returning Max to appellant "would be the worse thing that could happen" because his needs would not be met. Bonito explained that "Max would not be [appellant's] priority. He wasn't before, and he won't be this time." Bonito opined that while she feels that "a child belongs with his mother, * * * until [appellant] starts behaving more like his mother, Max cannot go back to her."
Bonito and Josslin both agreed that appellees were appropriate caregivers who met all of Max's needs. Sheri Schilling, whose son goes to school with Max, testified that appellees, whose parenting skills are very good, were doing an excellent job of caring for Max. Schilling also testified that appellees were involved in a lot of activities with Max. The record shows that Max is doing well in school, that he is actively involved in several athletic activities, and that appellees are actively involved in Max's educational, social, and athletic endeavors.
In light of all of the foregoing and after thoroughly reviewing the record, we find that competent, credible evidence supports the trial court's decision. We therefore hold that the trial court's decision to grant legal custody of Max to appellees under the trial court's continuing jurisdiction and subject to appellant's residual parental rights was not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and WALSH, J., concur.
[1] Mr. Heaffey's name is also spelled "Heafy" in several depositions.
[2] The $21,000 was incurred when Heaffey spent time in the hospital for broken ribs after he was the victim of a beating and robbery by the owner of a house in which Heaffey and appellant were "house-sitting."
[3] Josslin testified that under California law, he was Max's father but that he was not Max's biological father. Josslin explained that he was at first deceived into thinking he was the biological father of Max but that since 1993, appellant has maintained that he is not.
[4] Bonito explained that appellant goes "up and down the scale" emotionally, that she "gets into these crying jags" where "she will cry for hours and hours about something," and that appellant is also "given to having vivid nightmares."